**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>CHRISTOPHER LEE CARROLL, et al., )<br>)<br>Defendants. ) | Case No. 4:21-cr-00532-SEP |

### MEMORANDUM AND ORDER

Before the Court are Defendants' Motion for Mistrial or a New Trial, Doc. [426], and Motion for Acquittal, Doc. [427]. The motions are fully briefed and ready for disposition. *See* Docs. [436]-[439]. For the reasons set forth below, both motions are denied.

### BACKGROUND

Defendant Christopher Carroll was charged in the superseding indictment with three counts of aiding and abetting bank fraud in violation of 18 U.S.C. §§ 1344 and 2; three counts of aiding and abetting the making of a false statement to a financial institution in violation of 18 U.S.C. §§ 1014 and 2; one count of conspiracy to violate the Clean Air Act in violation of 18 U.S.C. § 371; sixteen counts of aiding and abetting the tampering with a Clean Air Act monitoring device in violation of 42 U.S.C. § 7413(c)(2)(C) and 18 U.S.C. § 2; and two counts of witness tampering in violation 18 U.S.C. § 1512(b)(3). *See* Doc. [162]. Defendant Whiskey Dix Big Truck Repair, LLC, was also charged with sixteen counts of aiding and abetting the tampering with a Clean Air Act monitoring device in violation of 42 U.S.C. § 7413(c)(2)(C) and 18 U.S.C. § 2. *See id*. The bank fraud counts and the making of a false statement to a financial institution counts all stem from Carroll's actions in relation to the Paycheck Protection Program (PPP). The Clean Air Act counts relate to Carroll and Whiskey Dix's actions in tampering with the Onboard Diagnostic System (OBD) of diesel trucks owned by Carroll.

Prior to trial, Defendants moved to prohibit the introduction of Carroll's prior conviction and his parole status. *See* Doc. [304]. The Government responded that Carroll's parole status was highly relevant to the alleged scheme to defraud, specifically Carroll's decision to omit his name—and the name of his business partner Reed—from the loan application. Doc. [328] at 2-3. The Government alleged that Carroll answered the form the way he did to avoid having to

1

disclose his parole status.  *Id*. at 3.  The Court agreed that evidence of Carroll's parole status was relevant to Carroll's intent and denied Defendants' motion.  *See* Doc. [386] at 5-11.

At trial, Colleen Forsythe, Director of Deposits at Enterprise Bank, explained that the PPP provided small businesses with loans so they could "stay functioning and operating during the pandemic."  Doc. [433] at 50-51.  Square One Group (SOG) was one of the companies that applied for a PPP loan.  SOG had a complicated ownership structure:  SOG was owned by Farmington Allegiance, LLC, which was owned by Mainline Partners, LLC, which was owned, at the relevant time, by two trusts in equal part.  Doc. [441-15].  The grantors of those trusts were Reed and Carroll.  *Id*.  Despite this layered corporate structure, Carroll's former parole officer, Officer Honerkamp, and two former SOG employees, Blake Wallace and William Harris, all testified that Carroll told them he was the owner of SOG.  *See* Doc. [433] at 35, 38, 111.  Carroll also referred to himself as the company's Chief Executive Officer in his email signature, *see* Doc. [441-9], and named himself "Chris Owner Square1" in the company group chat, *see* Doc. [441-10].  Pursuant to SOG's operating agreement, Carroll and Reed were SOG's only managers.  Doc. [441-7] at 7.  As managers, Carroll and Reed had "full and complete authority, power, and discretion to manage and control the business, affairs and properties of the Company[.]"  *Id*. at 2. Daniel Human, a former employee of SOG, testified that "no decisions got made without [Carroll] knowing about it or approving it."  Doc. [434] at 32.

In 2020 and 2021, SOG applied for PPP loans through Enterprise Bank.  *See* Docs. [433] at 55; [483-1]; [441-5].  As part of the First Draw PPP Loan Application, SOG had to certify that "the funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, or utility payments as specified under the Paycheck Protection Program rule."  *See* Docs. [483-1] at 6; [433] at 62.  SOG also had to "list all owners of 20% or more of the equity of the Applicant" (Applicant Ownership Box).  Doc. [483-1] at 5.  The First Draw PPP Loan Application considered the following parties "owners of the Applicant":

- For a sole proprietorship, the sole proprietor;
- For a partnership, all general partners, and all limited partners owning 20% or more of the equity of the firm;
- For a corporation, all owners of 20% or more of the corporation;
- For limited liability companies, all members owning 20% or more of the company; and
- Any Trustor (if the Applicant is owned by a trust).

2

*Id*. at 7.  Question 5 of the First Draw PPP Loan Application asked whether "the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant . . . [is] on probation or parole."  *Id*. at 5; Doc. [433] at 155-56.

The Government introduced text messages between Carroll, Reed, and Matthew Titus discussing the First Draw PPP Loan Application and the importance of applying quickly.  *See* Doc. [441-8] at 1 (Carroll: "The CARES Act loan is first come first serve so it is imperative that we apply for this in the morning.").  At the time, Titus was Director of Finance for SOG.  Doc. [434] at 34.  In the text chain, Titus stated that he listed Kimberly Carroll, LouAnn Reed, and Tim McFadden as "owners," and then sent a picture of a beneficial owner form from Enterprise Bank showing that he filled it out with Kimberly, LouAnn, and Tim's information.  Docs. [441-8] at 2-4; [433] at 181; [427-1].  Titus explained that Julie, an employee at Enterprise Bank, "told [them] to fill out just like the bank accounts."  Doc. [441-8] at 4.  Carroll responded, "Shit," and Reed directed Titus to exclude McFadden and just include Kimberly and LouAnn as owners.  *Id*. at 5.  Titus responded "10-4," but then later sent another picture and stated, "This is in all of the operating agreements.  Should I switch from Kim and LouAnn to you two or keep?"  *Id*. at 6.  Special Agent Mills testified that the picture Titus sent was of a signature page from an operating agreement.  Doc. [433] at 150.  He testified that SOG's operating agreement listed Reed and Carroll as managers of SOG, and that LouAnn and Kimberly were not listed anywhere in SOG's operating agreement.  Docs. [433] at 151; [441-7].  Reed told Titus to "[k]eep LAR n Kim.  We're members[.]"  Doc. [441-8] at 6.  Carroll did not object to Reed's direction, *id*. at 6-7, and the First Draw PPP Loan Application ultimately submitted by SOG listed Kimberly and LouAnn in the Applicant Ownership box with the title "Manager."  Doc. [483-1] at 5.

Shortly after Reed directed Titus to "[k]eep LAR n Kim," Titus sent a picture of his responses to Questions 1-6 on the First Draw PPP Loan Application and asked Reed and Carroll to "[p]lease confirm questions 1-6 are answered correctly."  Doc. [441-8] at 7.  The picture showed that Titus had responded "no" to Question 5, which asked whether the applicant (if an individual) or any individual owning 20% or more of the equity of the applicant was on parole.  *Id*.; Doc. [433] at 155-56.  Carroll, who was on parole at the time, responded, "[t]hey're correct."  *Id*.; Doc. [433] at 33.  Ms. Forsythe confirmed that Question 5 on SOG's application had in fact been answered "no."  Docs. [433] at 61; [483-1] at 5.  She also confirmed that if Question 5 had been answered "yes," Enterprise Bank would not have issued the loan.  Doc. [433] at 61.

3

The Government called Daniel Human to testify about a conversation he had with Carroll after the indictment came down. Doc. [434] at 35. Carroll asked Human to see if "there [was] anything in the indictment that perhaps they could attack or that was unjust or unfair." *Id*. After reading the indictment, Human asked Carroll "[h]ow do you get past the fact that you were on parole," and Carroll responded, "well, why do you think I didn't sign it." *Id*. at 36. Human also relayed a conversation he had with Carroll about listing Kimberly as a manager on the First Draw PPP Loan Application.

> A. . . . I asked him if he thought that him not signing the application would absolve him because he technically was not listed as an owner even though obviously he owned the company, but I think the shell groups that shielded he and George Reed from actual ownership were such that, you know, he wouldn't directly be associated, even though apparently they both had their wives' names as owners or managers or principals in Square One Group.
> Q. And what did he say about that?
> A. Well, at the time, at that time we didn't really get into that until subsequently sometime later when there was a conversation really about Kim.
> Q. What was the conversation about Kim?
> A. Well, the conversation about Kim was that he felt because of her medical status that if the government went after a woman in a wheelchair, they would look like a bunch of jerks.

*Id*. at 36-37.

The First Draw PPP Loan Application was signed by Titus on April 6, 2020, Doc. [483-1] at 6, and the loan was approved for $1,247,800. Doc. [433] at 63. Ms. Forsythe testified that the loan amount was based on the average monthly payroll amount listed in SOG's First Draw PPP Loan Application. *Id*. at 56. Carroll and Reed signed the note for the First Draw PPP Loan, Docs. [433] at 67; [441-3] at 5, and the money was deposited into SOG's bank account. Human testified that Carroll, Reed, and Titus "were tickled" when they received the PPP money. Doc. [434] at 35. He explained that "it was almost like it was found money that they weren't going to have to repay." *Id*. LouAnn Reed testified that Carroll said the PPP money "was free money from the government, that you didn't have to pay it back, and the best part was we didn't even need it." Doc. [433] at 241.

FBI Forensic Accountant Emily Scott testified that following the deposit of the First Draw PPP Loan, Carroll spent hundreds of thousands of dollars on trucks and land to start a new business called Whiskey Dix. Doc. [434] at 73-78. Brandon Sinclair, a former Whiskey Dix employee, testified that Carroll told him the money to fund Whiskey Dix came from "a PPP

4

loan." *Id*. at 116-17.  Ms. Forsythe confirmed that such purchases did not qualify as eligible expenses under the PPP.  *See* Doc. [433] at 94 (Ms. Forsythe confirming that "buying a bunch of assets for a totally unrelated business" was not an eligible expense).  According to Scott, Carroll made these purchases at a time when "dozens of [SOG] employees [were] not receiv[ing] a paycheck."  Doc. [434] at 78.  She elaborated:

> Q. Ms. Scott, how many names were on the list that Square One Group gave the bank in support of its application for a loan to protect paychecks?
> A. 97.
> Q. In May of 2020 after they got the PPP loan, did Square One Group come close to paying 97 people?
> A. No, they did not.
> Q. How about in June?
> A. No, they did not.
> Q. How about in July?
> A. No, they did not.
> Q. Were there dozens of employees in all of those months who did not get a paycheck from Square One Group?
> A. Yes.

*Id*. at 104.  Scott's testimony was corroborated by multiple former SOG employees who testified that they were sent home without pay for weeks and sometimes months.  *See* Docs. [433] at 43 (Blake Wallace testifying that he went without pay for "a few months"); 115 (William Harris testifying that he was furloughed and "on unemployment" for "six, seven weeks"); 123 (Heather Williams testifying that the only money she received came from unemployment and she eventually returned to work the first week of June); [434] at 60-61 (Jay Borders testifying that he was "laid off" and returned to work "two weeks after the first week of June").  Former Sales Director of SOG, Nick Chappell, testified about a message he sent his sales team in early April.  The message stated:

> I was just informed that during the remainder of the Coronavirus outbreak issue the company is downsizing from 8 teams to 3 and our[s] was one of the downsized. Once we are cleared to go back to work we'll be back on the road doing what we do. Feel free to file for unemployment. Everyone stay safe and once I know when we're scheduled to be back I'll let you know . . . .

Doc. [441-11] at 2.  According to Chappell, Carroll was the one who told him about downsizing and provided the instructions related to filing for unemployment.  Doc. [434] at 66-67.  Chappell testified that he was laid off by SOG around the same time as this message and did not return to work for "approximately three months."  *Id*. at 67.

5

The Government also presented evidence that some SOG employees went without health insurance while Carroll spent money on trucks and land for his new business. Despite promising his employees that he was going to "pay 100% of everybody's health insurance until this coronavirus thing is over," Doc. [441-10] at 1, Carroll authorized the termination of 17 employees' health insurance benefits just a few days before receiving the First Draw PPP Loan. Doc. [441-9]. Blake Wallace testified that he went without pay for a few months, during which time his health insurance was "not valid." Doc. [433] at 43. Nick Chappell was also sent home for months, during which time he did not have health insurance. Doc. [434] at 67-68.

On November 24, 2020, SOG sought to have the First Draw PPP Loan ($1,247,800) completely forgiven. Docs. [441-4]; [433] at 68. Ms. Forsythe testified that "loan forgiveness was a part of the [PPP] whereby if [the company] followed the rules of the program, utilized the funds for employment of their associates and proper rent payments and things of that sort, the SBA would forgive the loans, which means they did not have to pay it back." Doc. [433] at 54. She further testified that if the business did not use the loan to retain its workers and maintain payroll, the loan was not eligible for forgiveness. *Id*. at 55. The Government introduced a text exchange between Blake Wallace and Carroll demonstrating that Carroll knew about these limitations. *See* Docs. [441-1] at 3 (Carroll responded, "Yes," to Blake Wallace's text message stating, "I feel ya are you going to apply for the grant for business? Seems like it might be alright they say you don't have to repay it if your [sic] paying your employees during this time."). In the Forgiveness Application, companies were asked to check a box if they had "not reduced the number of employees or the average paid hours of your employees between January 1, 2020 and the end of the Covered Period [October 15, 2020]." Docs. [441-4] at 3; [433] at 68. SOG checked that box. *Id*. Ms. Forsythe confirmed that if Enterprise Bank had known that this representation was false, that would have influenced the bank's decision to approve forgiveness. Doc. [433] at 69.

SOG then applied for another PPP loan, this time in the amount of $1,633,830. Doc. [433] at 69-70. As part of the Second Draw PPP Loan Application, SOG certified that "the applicant received a First Draw Paycheck Protection Program Loan and, before the Second Draw Paycheck Protection Program Loan is disbursed, will have used the full loan amount (including any increase) of the First Draw Paycheck Protection Program Loan only for eligible expenses." Docs. [433] at 70; [441-5] at 2. SOG also certified that "[t]he funds will be used to retain

6

workers and maintain payroll." Doc. [433] at 71; [441-5] at 2.  Relying on these certifications, Enterprise Bank issued the loan for $1,633,830.  Doc. [433] at 71.  And as with the First Draw PPP Loan, Reed and Carroll signed the note on the loan.  Docs. [433] at 72; [441-6] at 6.

Scott testified that following the deposit of the Second Draw PPP Loan, Carroll took two separate owner draws, one in the amount of $160,000, and the other in the amount of $250,000.  Docs. [434] at 79-80; [441-2] at 4-5.  Reed also took a $250,000 owner draw.  Docs. [434] at 79-80; [441-2] at 6.  Scott confirmed that the owner draws would not have cleared without the deposit of the Second Draw PPP Loan.  Doc. [434] at 80.  Ms. Forsythe confirmed that the owner draws were not eligible expenses, and that Enterprise Bank would not have issued the loan had they known that Carroll and Reed would take out more than $660,000 in owner draws using the Second Draw PPP Loan funds.  Doc. [433] at 72, 95.

The Government also introduced evidence relating to Defendants' alleged tampering with a Clean Air Act monitoring device.  Three former employees of Carroll—Bruce Aden, Greg Hubbell, and Chip Forester—all testified that trucks had been "deleted" at Whiskey Dix.  *See* Doc. [434] at 156, 164, 178.  Expert witness Brent Ruminski explained that "[d]eleting a truck refers to the removal of the emission controls . . . and it also includes modifying the software on the ECM (Engine Control Module)."  *Id*. at 136; *see also* 174 (Special Agent Kenny Jamison confirming that deletion means "you are changing the on-board diagnostic system of the truck so that it won't detect the removal of the emissions control equipment").  Ruminski testified that the Onboard Diagnostic System (OBD) is part of the ECM:  "[t]he ECM itself is the hardware, but it contains software that includes the OBD." [1]  *Id*. at 145.  He explained that when the OBD detects that emissions controls aren't functioning, it can send the truck into limp mode, which "reduces [the] power and speed available to the driver."  *Id*. at 140.  Ruminski testified that you can prevent an OBD from sending a deleted truck into limp mode by "installing a tune onto the control system, or ECM . . . [which] allow[s] basically the OBD system to be modified in a way that it will no longer look for those malfunctions."  *Id*. at 140-41.

Special Agent Kenny Jamison was called to testify about his investigation into Carroll and Whiskey Dix.  SA Jamison confirmed that he found "multiple instances of thousands of dollars being paid by Defendant Carroll to Texas Truck Tuning for deletion services."  *Id*. at 175.

---

[1] The Government also produced a diagram showing that the OBD was a component of the ECM.  Doc. [441-14] at 4.

7

He also confirmed that the trucks described in the superseding indictment were required to have a functioning OBD, but service records from Whiskey Dix showed that the diagnostic systems had been tampered with by Whiskey Dix. *Id*.

Following a five-day trial, Defendants were convicted on all counts. *See* Doc. [412]. Defendants now move for a mistrial claiming that evidence of Carroll's prior conviction should not have been admitted. Doc [426] at 1. Defendants also move for acquittal on all counts except Counts 35 and 36, claiming that the "evidence is completely lacking to submit a guilty verdict 'beyond a reasonable doubt.'" Doc. [427] at 1.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Rule 33 relief is strong medicine that should be dispensed sparingly." *United States v. Hansen*, 111 F.4th 863, 869 (8th Cir. 2024) (citing *United States v. Harriman*, 970 F.3d 1048, 1058 (8th Cir. 2020)). "In evaluating a motion for Rule 33 relief, the 'court may weigh the evidence, disbelieve witnesses, and grant a new trial' when the 'evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred.'" *Id*. (quoting *Harriman*, 970 F.3d at 1058). But "[u]nless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002); *see also United States v. Fetters*, 698 F.3d 653, 656 (8th Cir. 2012) ("Motions for new trials are generally disfavored and will be granted only where a serious miscarriage of justice may have occurred." (quoting *United States v. Rice*, 449 F.3d 887, 893 (8th Cir. 2006))). "With respect to allegations of trial error, the court should 'balance the alleged errors against the record as a whole and evaluate the fairness of the trial' to determine whether a new trial is appropriate." *United States v. Davis*, 2024 WL 3924605, *2 (E.D. Mo. Aug. 23, 2024) (quoting *United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir. 1988)).

Federal Rule of Criminal Procedure 29 governs post-trial motions for judgment of acquittal. *See* Fed. R. Crim. P. 29(c)(2) ("If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."). Such motions "put[ ] in issue the sufficiency of the evidence to sustain the verdict." *United States v. Lincoln*, 630 F.2d 1313, 1316 (8th Cir. 1980). It is the duty of the Court to view the "evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that

8

support the verdict." *United States v. Garcia*, 646 F.3d 1061, 1066 (8th Cir. 2011) (citation and internal quotations omitted). "The standard for determining whether evidence is insufficient is very strict, requiring acquittal only where there is 'no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt.'" *United States v. Munoz*, 2012 WL 3031143, at *1 (D. Minn. July 25, 2012) (quoting *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir.1999)).

## DISCUSSION

### I.   Defendants are not entitled to a mistrial or new trial.

Defendants submit that a mistrial should be declared, or at a minimum, a new trial granted, claiming that "the highly unfair and prejudicial evidence that Mr. Carroll had a prior conviction should have never been admitted into evidence." Doc [426] at 1. Prior to trial, Defendants had argued that Carroll's parole status was not relevant because under the definition provided in the First Draw PPP Loan Application, the owner of SOG was Farmington Allegiance, not Carroll. Doc. [304] at 2.

In ruling on Defendants' initial motion, the Court first noted that the First Draw PPP Loan Application was not a model of clarity. Doc. [386] at 5. A reasonable person trying to truthfully fill the form out on behalf of SOG might have reached one of two conclusions:

> (1) that it sought information about the owner(s) of 20% or more the SOG, whether human beings or entities, in which case they would have entered Farmington Allegiance in the Applicant Ownership box; or
>
> (2) that it sought information about *individuals* who own the equity of the Applicant, whether or not their ownership is mediated through corporate entities, in which case the reasonable individual would have entered Carroll and Reed into the Applicant Ownership box.

*Id*. at 6-7. Either way, one might have checked "Yes" for Question 5, because it plainly asked for information about individual owners of equity, not corporate entities, and the only individuals who own equity in the company within the meaning of the form were Carroll and Reed. *Id*. at 7. But one might have interpreted the language "any individual" to contemplate the possibility that no such individual existed. *Id*. And so, filling it out with a "No," on the assumption that the only owner of equity in the company was Farmington Allegiance, would also have been reasonable. *Id*.

Because one of the possible answers would have put Carroll's name in the Applicant Ownership Box and suggested a "Yes" to Question 5, the Court held that the Government was

9

free to argue and present evidence that Carroll caused Kimberly Carroll and LouAnn Reed to be listed in the Applicant Ownership Box to avoid having to disclose his parole status. *Id*. at 5. The Court emphasized that the Government had not charged Carroll with making a false statement on Question 5. *Id*. at 9. The allegation was that Carroll's answer to Question 5 was part of a scheme to defraud. *Id*. And whether a person engaged in a scheme to defraud is a broader question than whether a discrete statement is true or false. *Id*.; *see United States v. Steffen*, 687 F.3d 1104, 1113 (8th Cir. 2012) ("[The Eighth Circuit has] previously characterized a scheme to defraud as 'a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community.'" (quoting *United States v. Britton*, 9 F.3d 708, 709 (8th Cir. 1993))). The Court concluded that the Government could try to convince the jury that Carroll was trying to conceal his connection to SOG by filling out the form the way he did, and Defendants could try to show that Carroll filled out the form based on an honest belief that the form was not asking for information about him because he was not the owner of SOG. Doc. [386] at 9-10. And because Carroll's intent was at issue, the Court also held that the Government could introduce evidence that Carroll was on parole for a felony. *Id*. at 10. The Court reasoned that Carroll's parole status was highly probative of why Carroll might have put someone else's name on the First Draw PPP Loan Application. *Id*.

Defendants now claim that there was "no justification for disclosure of [Carroll's] prior conviction," because there was "unrefuted evidence that under the definition of owner provided by the First Draw Application Chris Carroll was not an owner of Square One Group LLC." Doc. [426] at 1, 3. According to Defendants, the words in the First Draw PPP Loan Application "gave a singular definition of who was an owner—members of the LLC." *Id*. at 2. And Enterprise Bank employee Ms. Forsythe testified that the company had a right to rely on the definition supplied on the form. Doc. [433] at 74. Because the Government never introduced a "competing definition or interpretation to refute the straightforward definition that the jury was told that the company had the right to rely," Doc. [426] at 2, Defendants assert that the literally and factually correct answer that none of SOG's owners were on parole cannot form the basis for a fraud charge. *Id*. at 2. As such, Defendants maintain that the "highly unfair and prejudicial evidence that Mr. Carroll had a prior conviction should have never been admitted into evidence." *Id*. at 1.

10

The Court rejects Defendants' arguments for the same reasons as stated in its prior ruling. Proof of an affirmative misrepresentation is not required to sustain a conviction under 18 U.S.C. § 1344(1). "[F]raud includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information." *United States v. Steffen*, 687 F.3d 1104, 1113. Thus, the Government was permitted, but *not required*, to introduce a competing definition or interpretation of who was an owner. Because even without a competing definition or interpretation, the jury could have reasonably concluded that Carroll took acts to conceal his parole status with the intent of deceiving the lender. As the Court stated in it prior ruling, it was up to the jury to resolve the disputed facts about what Carroll understood the form to mean, whether he caused it to be filled out the way that it was, and if so, why. And Carroll's parole status was highly probative of why he might have filled the form out in the way he did. Moreover, the Court provided the jury with a good faith instruction that adequately informed the jury that a conviction could not stand if Carroll truly believed he filled the form out correctly. *See* Doc. [408] at 17; *see also United States v. Mann*, 2000 WL 1597824, at *4-5 (6th Cir. 2000) (unpublished table decision) (upholding district court's refusal to give a "literal truth" instruction in a 18 U.S.C. § 1344 prosecution because "there is no 'literally true' defense to § 1344(1) prosecutions" and "the good faith instruction that the court gave adequately informed the jury that [the defendant] would lack the necessary scienter for the offense if he truly believed that the statements he made on the Borrower's Certificates were true"). Thus, while a prior conviction is always prejudicial, the probative value of Carroll's prior conviction outweighed any prejudicial effect. *See* Fed. R. Evid. 403.

Moreover, even if the Court erred in admitting evidence of Carroll's conviction, Defendants could not obtain a new trial on that ground because "[a]n allegedly erroneous evidentiary ruling does not warrant a new trial 'unless the evidence was so prejudicial that a new trial would likely produce a different result.'" *Harrison v. Purdy Bros. Trucking Co.*, 312 F.3d 346, 351 (8th Cir. 2002) (quoting *Bevan v. Honeywell, Inc.*, 118 F.3d 603, 612 (8th Cir. 1997)). As described in greater detail in the next section, Carroll's concealment of his parole status was not the only basis for the bank fraud charges. And given the strength of the Government's evidence on all the counts, the Court finds that a new trial would not likely produce a different result.

## II. **Defendants are not entitled to acquittal on any of the counts.**

Defendants move for acquittal on all counts except Counts 35 and 36. Count 1 includes the submission of the note signed by Carroll for the First Draw PPP Loan; Count 2 includes the submission of the Forgiveness Application; Count 3 includes the submission of the note signed by Carroll for the Second Draw PPP loan; Count 10 includes the false statement on the First Draw PPP Loan Application that Kimberly Carroll and LouAnn Reed were the managers of SOG; Count 11 includes the false statement on the Forgiveness Application that SOG had "not reduced the number of employees or the average paid hours of [their] company's employees between January 1, 2020 and the end of the Covered Period"; and Count 12 includes the false statements in the Second Draw PPP Loan Application that SOG had used the full amount of the First Draw PPP loan (including any increase) of the First Draw Paycheck Protection Program Loan for permitted expenses and that SOG would use the Second Draw PPP funds to retain workers and maintain payroll. *See* Doc. [408]. Counts 14-18, 20-22, 24, 26-31, and 33 allege Clean Air Act violations. *See id*.

### A. The evidence presented at trial was sufficient for the jury to find that Defendant Carroll knew that the offense was being committed or going to be committed in Counts 1-3 and 10-12.

For Counts 1-3 and 10-12, the jury was instructed that Carroll "may be found guilty of each of the crimes charged . . . even if [Carroll] personally did not do every act constituting the offense charged, if [Carroll] aided and abetted the commission of the crime." Doc. [408] at 8. The jury was further instructed that, in order to have aided and abetted the commission of the crimes charged, Carroll must, either before or at the time the crime was committed:

(1) have known that the offense was being committed or going to be committed;

(2) have had enough advance knowledge of the extent and character of the offense that the defendant was able to make the relevant choice to walk away from the offense before all elements of that offense were complete;

(3) have knowingly acted in some way for the purpose of causing or aiding the commission of the offense; and

(4)   (a) for Counts 1 through 3 (bank fraud), have intended to defraud; or

  (b) for Counts 10 through 12 (false statement to a financial institution), have known the statements were false . . . .

*Id*.

Carroll argues that the Government failed to prove the first element:  knowledge that the offense was being committed or going to be committed.  Doc. [427] at 2.  He asserts that "[d]efinitively missing from this trial was any testimony from anyone who participated in preparing or submitting the two loan applications" or "any evidence that Chris Carroll ever saw either of the two loan applications or the Forgiveness [A]pplication."  *Id*. at 2-3.  Contrary to Defendants' argument, the evidence presented at trial was sufficient for the jury to reasonably conclude that Carroll knew about the representations in the First Draw PPP Loan Application, the Forgiveness Application, and the Second Draw PPP Loan Application.  *See United States v. Surratt*, 172 F.3d 559, 565 (8th Cir. 1999) ("It is not necessary for the evidence before the jury to rule out every reasonable hypothesis of innocence.  It is enough that the entire body of evidence be sufficient to convince the fact-finder beyond a reasonable doubt of the defendant's guilt." (citing *United States v. Noibi*, 780 F.2d 1419, 1422 (8th Cir. 1986))).

The evidence at trial established that Carroll was significantly involved in the business decisions of SOG.  As a manager, Carroll had "full and complete authority, power, and discretion to manage and control the business, affairs and properties of the Company," Doc. [441-7] at 2.  In fact, Carroll considered himself the owner of SOG.  Docs. [433] at 35, 38, 111; [441-9]; [441-10].  And according to Daniel Human, "no decisions got made without [Carroll] knowing about it or approving it," Doc. [434] at 32.  Because of his role in the company, Carroll was required to sign the note for the First Draw PPP Loan and the Second Draw PPP Loan.  Docs. [433] at 65; [441-3] at 5; [441-6] at 6.  As argued by the Government, the jury could have reasonably inferred that a hands-on executive such as Carroll knew what information his company communicated in the three applications to secure "nearly $3 million" from the federal government.  Doc. [437] at 3-4*; see United States v. Gardner*, 204 F. Supp. 3d 1057, 1063 (D. Minn. 2016) ("The fact that [the defendant] was chairman of the board and a member of the bank's loan committee—and the fact that he was directly involved in approving the loan—is strong circumstantial evidence that he read the credit presentation.").

The jury could also have reasonably inferred that Carroll knew about the representations in the First Draw PPP Loan Application based on Daniel Human's testimony and the text messages between Carroll, Titus, and Reed discussing the First Draw PPP Loan Application.  *See* Docs. [441-8]; [434] at 35 (Carroll responding, "[W]ell, why do you think I didn't sign it"); 36-37 ("Well, the conversation about Kim was that he felt because of her medical status that if

13

the government went after a woman in a wheelchair, they would look like a bunch of jerks."). That evidence, viewed in the light most favorable to the verdict and granting all reasonable inferences in favor of the Government, established that Carroll intentionally concealed his name on the First Draw PPP Loan Application to avoid disclosing his parole status.

The evidence at trial also established that Carroll knew that the First Draw PPP Loan would be forgiven only if the funds were used to maintain payroll, and yet he chose to use the loan proceeds to buy trucks and land for his new business while his employees went without pay and health insurance. *See* Docs. [441-1] at 3 (Carroll responding "Yes," to Blake Wallace's text stating, in part, "they say you don't have to repay it if your [sic] paying your employees during this time"); [434] at 78, 104 (Scott testifying that dozens of SOG employees did not receive a paycheck); 116-17 (Sinclair testifying that Carroll told him some of the money to fund Whiskey Dix came from "a PPP loan"); [433] at 43, 115 (former employees testifying they were sent home without pay); [434] at 60-61, 67 (same); [441-9] (Carroll authorizing the termination of 17 employees' health insurance); [433] at 43 (former employee testifying that he did not have health insurance for months); [434] at 67-68 (same). Such actions, especially when coupled with LouAnn Reed's testimony that Carroll referred to the PPP money as "free money" that "we didn't even need," Doc. [433] at 241, provided the jury with sufficient evidence to reasonably conclude that Carroll knowingly participated in the bank fraud scheme as alleged in Counts 1 and 2, as well as making the false statement in the Forgiveness Application that SOG had not reduced the number or the average paid hours of their employees as alleged in Count 11.

Finally, as it specifically relates to the representations in the Second Draw PPP Loan Application, the jury heard Forensic Accountant Scott testify that following the deposit of the Second Draw PPP Loan, Carroll and Reed took out owner draws that would not have cleared without the deposit of the Second Draw PPP Loan. Doc. [434] at 79-80; *see* Doc. [441-2] at 4-6. Given Carroll's actions following the deposit of the Second Draw PPP Loan and evidence of Carroll's involvement with the First Draw PPP Loan Application and the Forgiveness Application, the jury could have reasonably concluded that Carroll knowingly participated in the bank fraud scheme and the making of a false statement as alleged in Counts 3 and 12.

### B. The evidence presented at trial was sufficient for the jury to find that Defendant Carroll knowingly acted in some way for the purpose of causing or aiding the commission of Counts 2 and 11.

Carroll next argues that the Government failed to present any evidence that he knowingly acted in some way for the purpose of causing or aiding the commission of Counts 2 and 11. According to Carroll, "[a]t least as to both loan applications, the Government can point to [ ] Carroll signing the loan note . . . , [b]ut for the Forgiveness Application, the Government did not offer a scintilla of evidence that [ ] Carroll took any action whatsoever." Doc. [427] at 4. "[A] person is liable under [18 U.S.C.] § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014); *see United States v. Mitchell*, 388 F.3d 1139, 1143–44 (8th Cir. 2004) ("There are three essential elements of aiding and abetting: (1) the defendant associated h[im]self with the unlawful venture; (2) the defendant participated in it as something []he wished to bring about; and (3) the defendant sought by h[is] actions to make it succeed.").

Because the PPP counts are interconnected, in deciding whether there was sufficient evidence for the jury to find that Carroll knowingly acted in some way for the purpose of causing or aiding the commission of Counts 2 and 11, the Court must consider *all* the evidence related to *all* the PPP counts. As already outlined above, viewed in the light most favorable to the verdict and granting all reasonable inferences in favor of the Government, that evidence established that Carroll was a hands-on executive who intentionally concealed his name on the First Draw PPP Loan Application to avoid disclosing his parole status. It also established that, despite the representation in the First Draw PPP Loan Application that the PPP funds would be used to "retain workers and maintain payroll," Carroll let his employees go without paychecks and health insurance while he used the PPP funds to start a new business. SOG was then absolved of repaying the First Draw PPP Loan based on misrepresentations in the Forgiveness Application that SOG had used the First Draw PPP Loan on costs eligible for forgiveness and that SOG had not reduced the number or average paid hours of their employees. SOG then received an additional $1.6 million in PPP funds based on the representations in the Second Draw PPP Loan Application that SOG had used the First Draw PPP Loan on permitted expenses and that it would use the Second Draw PPP funds to retain workers and maintain payroll. Finally, the Government

15

put on evidence that Carroll and Reed used the Second Draw PPP proceeds to fund $660,000 in owner draws—owner draws that would not have cleared but for the PPP loan.

Under an aiding and abetting theory, the Government needed to prove only that Carroll "associated himself with the unlawful venture, participated in it as something he wished to bring about, and by his action sought to make the activity succeed." *United States v. Clark*, 980 F.2d 1143, 1146 (8th Cir. 1992). The evidence recounted above established Carroll's participation in an overarching scheme to obtain "free money" from the federal government. The Government's showing was more than sufficient for a reasonable jury to convict Carroll of aiding and abetting bank fraud and the making of a false statement as alleged in Counts 2 and 11.

### C. The evidence presented at trial was sufficient for the jury to find that the statement in the Forgiveness Application was false.

Carroll also argues that the Government failed to prove that the statement in the Forgiveness Application was false. He asserts that Count 11 in the superseding indictment alleged, in part, that Carroll "knowingly made a false statement . . . that Square One Group had 'not reduced the number of employees or the average paid hours of [their] employees between January 1, 2020 and the end of the Covered Period,' despite the fact that, as Defendant Chris Carroll and George Reed knew, Square One Group had furloughed employees without compensation and reduced the number of employees *during the covered period of the loan*." Doc. [162] ¶ 90 (emphasis added). Carroll explains that the phrase "during the covered period of the loan" has a specific definition in the Forgiveness Application; that is, the period between May 1, 2020, to October 15, 2020. *See* Doc. [441-4]. The Government repeated this definition in the superseding indictment. *See* Doc. [162] ¶ 45 ("During the covered period of the First Draw PPP loan, which was from May 1, 2020 until October 15, 2020 . . . ."). Carroll argues that while the Government can point to "plenty of evidence that before May there was downsizing, the Government can point to no evidence that any employee was laid off during 'the covered period.'" Doc. [438] at 6.

While Carroll's objection relies on language from the superseding indictment, the Court—with no objection from Carroll and consistent with the false statement alleged in the

16

superseding indictment[2]—instructed the jury that it must find, *inter alia*, that Carroll "knowingly aided and abetted the making of a false statement; that is, that Square One Group had not reduced the number of employees or the average paid hours of its employees *between January 1, 2020, and October 15, 2020*, to Enterprise Bank and Trust."  Doc. [408] at 15 (emphasis added). And the evidence presented at trial was more than sufficient for the jury to find that (1) the statement was false and (2) Carroll knew that the statement was false.  *See* Docs. [434] at 78-78, 104 (Scott testifying that dozens of SOG employees did not receive a paycheck); [433] at 43, 115 (former employees testifying they were sent home without pay); [434] at 60-61, 67 (same); [434] at 64-67 (Chappell testifying that Carroll was the one who told him about the downsizing and provided the instructions related to filing for unemployment). [3]

### D. The evidence presented at trial was sufficient for the jury to find that the statement in the Second Draw PPP Loan was false.

Carroll also argues that the Government failed to prove that the statement in the Second Draw PPP Loan, as alleged in Count 12, was false.  The Government alleged that the Second Draw PPP Loan Application included the false statement that SOG had used the full amount of the First Draw PPP loan (including any increase) of the First Draw Paycheck Protection Program Loan for permitted expenses and that it would use the Second Draw PPP funds to retain workers and maintain payroll.  Doc. [162] ¶ 92.

Carroll first claims that Scott made several admissions on cross-examination that "completely negate any theory that after obtaining the first draw the company did not 'retain workers and maintain payroll.'"  Doc. [438] at 7.  Such admissions included that the number of SOG employees increased from May to June and June to July, Doc. [434] at 94, and that when calculating how many employees did not receive a paycheck, she did not consider whether the employee had quit or if the employee even wanted to come back to work, Doc. [434] at 94-95

---

[2] The superseding indictment also states:  "In Square One Group's First Draw PPP loan forgiveness application, George Reed and Defendant Chris Carroll falsely indicated that Square One Group had 'not reduced the number of employees or the average paid hours of [their] employees between January 1, 2020 and the end of the Covered Period,' *despite the fact that, as Defendant Chris Carroll and George Reed knew, Square One Group had furloughed its sales force and suspended their compensation for a period of more than two months*."  Doc. [162] ¶ 65 (emphasis added).

[3] Carroll briefly argues that because SOG qualified for forgiveness under the alternative calculation methodologies, the false statement that SOG had not reduced the number of employees or the average paid hours of its employees was immaterial.  Contrary to Carroll's assertion, Ms. Forsythe confirmed that had Enterprise Bank known that this statement was false, it would have influenced the bank's decision to advance forgiveness.  Doc. [433] at 69.

17

(Scott: "I compared the information that they provided to the bank for the payroll number that they used on the first draw application . . . and then I looked to see if those individuals did in fact receive paychecks during this time period and counted whether they did or did not.").

In considering a motion for judgment of acquittal, the Court "must neither assess the witnesses' credibility nor weigh the evidence." *United States v. Johnson*, 474 F.3d 1044, 1048 (8th Cir. 2007).  It was up to the jury to decide how much weight to give Scott's testimony. Viewing the evidence in the light most favorable to the verdict and granting all reasonable inferences in favor of the Government, the Government established that Carroll spent hundreds of thousands of dollars on trucks and land to start a new business while dozens of his employees went without pay.  Docs. [434] at 73-78, 104 (Scott testifying that dozens of SOG employees did not receive a paycheck); [433] at 43, 115 (former employees testifying they were sent home without pay); [434] at 60-61, 67 (same).  Thus, the jury could have reasonably concluded that SOG had not in fact used the First Draw PPP Loan on permitted expenses.

Carroll also claims that there was no evidence that SOG reduced its workforce and payroll after receiving the Second Draw PPP Loan Application.  Doc. [438] at 7.  But the jury heard from Scott that shortly after receiving the Second Draw PPP Loan proceeds, Carroll and Reed took out $660,000 in owner draws—owner draws that would not have cleared but for the PPP loan.  Docs. [434] at 79-80; [441-2] at 4-6.  Based on Scott's testimony, the Government produced sufficient evidence for the jury to reasonably conclude that the Second Draw PPP funds were not used to "retain workers and maintain payroll."

### E. The evidence presented at trial was sufficient for the jury to find that Defendants tampered with the Onboard Diagnostic Device.

Jury Instruction 19 lists the elements of the Clean Air Act violations as charged in Counts 14-18, 20-22, 24, 26-31, and 33.

> *One*, the defendant you are considering knowingly aided and abetted the tampering with or rendering inaccurate of a monitoring device;
>
> *Two*, the monitoring device was required to be maintained under the Clean Air Act.
>
> A vehicle's Onboard Diagnostic System is a monitoring device required by the Clean Air Act.

Doc. [408] at 25.

Defendants maintain that the evidence at trial established that the ECM, not the OBD, was manipulated.  First, Defendants point to the receipt from Texas Truck Tuning showing that

18

the company billed Whiskey Dix for "Service ECM Calibration (deleted)." Docs. [441-13]; [434] at 172-75.  Second, Defendants point to the testimony of the three former employees who each mentioned manipulating the ECM, but never mentioned OBDs.  *See* Doc. [434] at 114, 117 ("You have to . . . tune the ECM to delete the vehicle" by "hooking a computer to [the ECM] and manipulating the files inside the ECM."); 166 ("[For the truck to run right after you delete it,] [y]ou have to go in and reprogram the whole ECM on the unit."); 180 (confirming that "[s]omebody would need to reprogram the ECM").  Finally, Defendants points to Ruminski's testimony where he confirmed that the sensors in the pollution control system report information to the ECM, Doc. [434] at 146; that the tune file is installed on the ECM, *id.*; and that the tune file tells the ECM how to operate, 147.

Defendants' argument is unavailing.  Ruminski clearly testified that the OBD is part of the ECM, and that installing a tune on the ECM causes the OBD to no longer look for malfunctions.  *See* Doc. [434] at 134-41.  The evidence Defendants point to does nothing to call Ruminski's testimony into question, and Ruminski's testimony was sufficient to support the jury's verdict.  As such, the Court denies Defendants' motion for acquittal on the Clean Air Act violations.

## CONCLUSION

Because the probative value of Carroll's prior conviction outweighed any prejudicial effect, the Court denies Defendants' motion for a new trial or mistrial on that basis.  The Court also denies Defendants' motion for acquittal because there was sufficient evidence for the jury to convict on all counts.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Motion for Mistrial or a New Trial, Doc. [426], and Motion for Acquittal, Doc. [427], are **DENIED**.

Dated this 6th day of February, 2025.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE